## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GUARDANT HEALTH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 24-687-RGA |
| | ) | |
| TEMPUS AI, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT TEMPUS AI, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

*Of Counsel*:

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Kevin P.B. Johnson
Andrew Bramhall
Margaret Shyr
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
(650) 801-5000
kevinjohnson@quinnemanuel.com
andrewbramhall@quinnemanuel.com
margaretshyr@quinnemanuel.com

David Bilsker
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
davidbilsker@quinnemanuel.com

Dated: October 21, 2024

YOUNG CONAWAY STARGATT
& TAYLOR, LLP
Pilar G. Kraman (No. 5199)
Jennifer P. Siew (No. 7114)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
jsiew@ycst.com

*Attorneys for Tempus AI, Inc.*

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................1

II.     SUMMARY OF THE ARGUMENT ........................................................................1

III.    FACTUAL BACKGROUND ....................................................................................2

        A.      The '992 Patent Family (Exs. B-D) and '306 Patent (Ex. A) ....................3

        B.      The '693 Patent (Ex. E) .............................................................................3

        C.      Guardant's *Inter Partes* Review Petitions ................................................4

IV.     LEGAL STANDARD ...............................................................................................5

        A.      Motion to Dismiss Under Rule 12(b)(6) and Section 101 ..........................5

        B.      The Section 101 Inquiry For Diagnostic Method Claims ...........................5

V.      ARGUMENT .............................................................................................................7

        A.      The '992 Patent Family And '306 Patent Are Invalid Under 35 U.S.C. §
                101 ..............................................................................................................7

                1.      *Alice* Step One: The Asserted Claims Are Directed To Observing
                        Natural Phenomena ........................................................................7

                2.      *Alice* Step Two: the Asserted Claims Only Append Conventional
                        Steps to Natural Phenomena ...........................................................9

        B.      The '693 Patent Is Invalid Under 35 U.S.C. § 101 ...................................15

                1.      *Alice* Step One: Claim 14 Is Directed To A Natural Law.............15

                2.      *Alice* Step Two: Claim 14 Adds No More Than Conventional Steps
                        To The Natural Phenomena To Which The Claim Is Directed .............17

VI.     CONCLUSION ........................................................................................................20

## **TABLE OF AUTHORITIES**

**Page(s)**

### **Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Intern.*,
  573 U.S. 208 (2014)..................................................................................1, 5, 20

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
  788 F.3d 1371 (Fed. Cir. 2015)...........................................................1, 7, 12, 15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..............................................................................................5

*Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*,
  915 F.3d 743 (Fed. Cir. 2019).....................................................................6, 7, 8

*Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*,
  927 F.3d 1333 (Fed. Cir. 2019)............................................................................7

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..............................................................................................5

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018).............................................................................5

*Bilski v. Kappos*,
  561 U.S. 593 (2010)..............................................................................................5

*In re BRCA1- & BRCA2-Based Hereditary Cancer Test Pat. Litig.*,
  774 F.3d 755 (Fed. Cir. 2014).............................................................................17

*CareDx, Inc. v. Natera, Inc.*,
  40 F.4th 1371 (Fed. Cir. 2022) ................................................................... *passim*

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
  760 F. App'x 1013 (Fed. Cir. 2019) .....................................................................6

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
  859 F.3d 1352 (Fed. Cir. 2017)...................................................................5, 7, 16

*Diamond v. Diehr*,
  450 U.S. 175 (1981)..............................................................................................5

*Esoterix Genetic Labs LLC v. Qiagen, Inc.*,
  133 F. Supp. 3d 349 (2015) ................................................................................16

*Finjan LLC v. ESET, LLC*,
    51 F.4th 1377 (Fed. Cir. 2022) ...........................................................................................11

*Genetic Techs. Ltd. v. Lab'y Corp. of AmericaHoldings*,
    2014 WL 4379587 (D. Del. Sept. 3, 2014)..........................................................................16

*Genetic Techs. Ltd. v. Merial L.L.C.*,
    818 F.3d 1369 (Fed. Cir. 2016)......................................................................................15, 16

*In re Grams*,
    888 F.2d 835 (Fed. Cir. 1989)..............................................................................................17

*Illumina, Inc. v. Ariosa Diagnostics, Inc.*,
    967 F.3d 1319 (Fed. Cir. 2020).............................................................................................6

*Mayo Collaborative Servs. v. Prometheus Labs, Inc.*,
    566 U.S. 66 (2012) ....................................................................................................... *passim*

*Natera, Inc. v. CareDx, Inc.*,
    705 F. Supp. 3d 258 (D. Del. 2023)..................................................................................8, 20

*PerkinElmer, Inc. v. Intema Ltd.*,
    496 F. App'x 65 (Fed. Cir. 2012) .........................................................................................16

*Princeton Digital Image Corp. v. Konami Digital Ent. Inc.*,
    2017 WL 239326 (D. Del. Jan. 19, 2017)..............................................................................4

*Roche Molecular Sys., Inc. v. CEPHEID*,
    905 F.3d 1363 (Fed. Cir. 2018)............................................................................................12

*Sands v. McCormick*,
    502 F.3d 263 (3d Cir. 2007)...................................................................................................4

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014)................................................................................................5

## <u>Statutes</u>

35 U.S.C. § 101...................................................................................................... *passim*

## I.    INTRODUCTION

Defendant Tempus AI, Inc. ("Tempus") respectfully moves to dismiss Plaintiff Guardant Health, Inc.'s ("Guardant") complaint for failure to state a claim upon which relief can be granted.

Guardant alleges that Tempus' cell-free DNA (cfDNA) liquid biopsy assays, which oncologists use to treat and monitor cancer patients, infringe five patents (the "Asserted Patents").[1] Even accepting all allegations as true, Guardant's complaint should be dismissed. The Asserted Patents are each directed to either natural phenomena or processes to detect natural phenomena that rely exclusively on well-known and conventional techniques. The Asserted Patents, which are attached to the Complaint, establish that each element of each asserted claim was a well-known, accepted convention *before* the Asserted Patents' priority dates. So do Guardant's admissions during *inter partes* review ("IPR") proceedings about identical technology. Thus, the Asserted Patents are invalid and patent ineligible under 35 U.S.C. § 101.

## II.    SUMMARY OF THE ARGUMENT

The Asserted Patents all relate to the same core idea—detecting changes in cfDNA, free-floating DNA found in blood, can be a sign of cancer. It is well-settled that "laws of nature, natural phenomena, and abstract ideas are not patentable." *Mayo Collaborative Servs. v. Prometheus Labs, Inc.*, 566 U.S. 66, 70 (2012); *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 573 U.S. 208 (2014). Nor are claims directed at detecting natural phenomena like the presence of cfDNA or the relationship between cfDNA and a medical condition if such methods rely on processes that are already well-known and conventional. *CareDx, Inc. v. Natera, Inc.*, 40 F.4th 1371, 1379 (Fed. Cir. 2022) (claims for predicting the likelihood of organ transplant rejection based on cfDNA were not patent eligible); *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1376 (Fed. Cir. 2015) (claims

---

[1] U.S. Patent Nos. 9,902,992 ("the '992 Patent"), 10,501,810 ("the '810 Patent"), 10,793,916 ("the '916 Patent"), 11,149,306 ("the '306 Patent"), and 11,643,693 ("the '693 Patent").

for detecting cfDNA to make fetal diagnoses were not patent eligible). Whether a process is known and conventional can be gleaned from the patents themselves. *CareDx*, 40 F.4th at 1378.

In this case, the Asserted Patents claim methods either for detecting cfDNA in patients (the '922, '810, '916, and '306 Patents) or for determining the likelihood of cancer in patients based on detecting cfDNA (the '693 Patent). The Asserted Patents concede, however, that, as of September 2012—the earliest claimed priority date—the existence of cfDNA was well-known and the claimed techniques used to detect it were well-established. These concessions render the Asserted Patents invalid as a matter of law under 35 U.S.C. § 101.

## III.    FACTUAL BACKGROUND

Guardant's Asserted Patents relate to diagnostic methods for cancer detection that rely on analysis of cfDNA. While most DNA is located in cell nuclei, cfDNA is free-floating DNA shed from cells (*e.g.*, when cells die) and found circulating in blood. cfDNA may include DNA from cancerous cells or tissues such as tumors, which differ from a patient's healthy DNA in various known ways. Detecting the molecular presence of cancer based on cfDNA in a patient's blood can be useful to detect cancer in its early stages or to determine if cancer has recurred after treatment.

None of the Asserted Patents purport to have invented analyzing cfDNA for cancer detection or monitoring. Nor could they. They admit that the detection of cfDNA predates the earliest priority date of each patent.[2] *See, e.g.*, Ex. B[3], 1:33-57, 1:53-57 ("improvements in sequencing and techniques to manipulate nucleic acids" such as cfDNA were pre-existing in 2012). Indeed, as discussed below, the Asserted Patents each refer to the routine and conventional nature of the claimed method steps and provide expressly that techniques known in the art can be used to

---

[2]  The Asserted Patents' earliest claimed priority date is <u>Sept. 4, 2012</u>. All but the '693 Patent claim priority to 2012 or 2013; the latter's earliest priority claim is to <u>Jan. 31, 2019</u>. Tempus assumes for this motion that each Asserted Patent is entitled to its earliest claimed priority date.
[3]  Citations to "Ex. __" refer to the exhibits attached to Guardant's Complaint (D.I. 1).

carry them out. In addition, Guardant, when seeking to invalidate competitors' patents during IPR proceedings, admitted the same steps were well-known before the Asserted Patents' earliest priority date. Thus, the Asserted Patents are subject matter ineligible.

### A.    The '992 Patent Family (Exs. B-D) and '306 Patent (Ex. A)

The claims of the '992, '810, and '916 Patents (the "'992 Patent Family"), as well as the '306 Patent, are all directed to methods of detecting genetic variants and rare mutations in cfDNA for the purpose of detecting diseases, such as cancer. Ex. A, 1:21-55, 2:1-44; Ex. B, 1:31-2:8; Ex. C, 1:26-2:3; Ex. D, 1:29-2:6. The '992 Patent Family shares a common specification and nearly identical disclosures.[4] Guardant asserts a single independent claim from each: '992 Patent claim 1, '810 Patent claim 1, '916 Patent claim 13, and '306 Patent claim 1. *See* A1-A16 (reciting asserted claims in full).[5] For purposes of this motion, these claims are representative because the dependent claims do not meaningfully add anything beyond what is already recited.

The methods disclosed in the '992 Patent Family and '306 Patent representative claims are essentially composed of three basic steps for identifying certain genetic characteristics in cfDNA:

1.    collecting cfDNA from a biological sample (*e.g.*, '992, claim 1(a); '810, claim 1(a); '916, claim 13, preamble; '306, claim 1(a));

2.    sequencing cfDNA, including tagging with barcodes, amplification, and sequencing to produce sequence reads (*e.g.*, '992, claim 1(b)-(d); '810, claim 1(b)-(e); '916, claim 13(a)-(c)); '306, claim 1(b)-(d); and

3.    analyzing properties of the cfDNA using bioinformatics tools (*e.g.*, '992, claim 1(e)-(h); '810, claim 1(f)-(h); '916, claim 13(d); '306, claim 1(e).

As discussed below, despite their jargon, each step is a conventional way of observing cfDNA.

### B.    The '693 Patent (Ex. E)

---

[4]    The '992, '810, and '916 Patents have nearly identical disclosures, apart from portions of three columns in the '992 Patent. *See* Ex. A, 41:25-65, 42:9-23, 42:30-43, 42:47-43:12.

[5]    Citations to "A_" refer to the appendix filed herewith pursuant to D. Del. LR 7.1.3(d).

The '693 Patent's claims relate to known techniques of using cfDNA to obtain genetic information for purposes of determining a subject's "likelihood" of having cancer. Guardant asserts independent claim 14. *See* A16. That claim is also representative for purposes of this motion. Specifically, claim 14 is essentially composed of five basic steps:

1.    collecting cfDNA (claim 14(a));

2.    capturing cfDNA molecules (claim 14(b));

3.    sequencing cfDNA, including at different sequencing depths (claim 14(c));

4.    analyzing sequencing data and mapping to reference sequences (claim 14(d) and (e));

5.    processing sequencing data to determine a likelihood a subject has cancer (claim 14(preamble) and 14(f)).

As such, the '693 Patent is directed to applying natural correlations between observed natural phenomena (cfDNA) and disease (cancer) to make a predictive determination by standard techniques performed in standard ways.

### C.    Guardant's *Inter Partes* Review Petitions

In 2017 and 2022, Guardant filed numerous IPR petitions challenging the validity of patents held by its competitors, Foundation Medicine and Twinstrand Biosciences. *See, e.g.*, A64-A67. Guardant challenged patents relating to cfDNA analysis/detection with December 2010 and March 2012 priority dates. In those petitions, Guardant argued that the technology recited in virtually every step of the Asserted Patents' claims in this case were known and conventional at the time. Those admissions directly apply here, as they show the Asserted Patent claim steps were conventional well before September 2012, the earliest claimed priority date.[6]

---

[6]    The Court can take judicial notice of Guardant's public IPR petitions. *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007); *Princeton Digital Image Corp. v. Konami Digital Ent. Inc*., 2017 WL 239326, at *3 n.7 (D. Del. Jan. 19, 2017) (taking judicial notice of IPR statements for a motion to dismiss), *report and recommendation adopted*, 2017 WL 1196642 (D. Del. Mar. 30, 2017).

## IV.    LEGAL STANDARD

### A.    Motion to Dismiss Under Rule 12(b)(6) and Section 101

To survive dismissal, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Dismissal is appropriate where "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

Patentability under 35 U.S.C. § 101 is a threshold legal issue that should be answered early in a case. *Bilski v. Kappos*, 561 U.S. 593, 602 (2010)); *see also Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 717-18 (Fed. Cir. 2014) (Mayer, J., concurring). A § 101 inquiry is properly raised at the pleadings stage if it is apparent from the face of the patent that the asserted claims are not directed to patent-eligible subject matter. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018); *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017) ("[W]e have repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced.").

### B.    The Section 101 Inquiry For Diagnostic Method Claims

Section 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has held that § 101 "contains an important implicit exception. '[L]aws of nature, natural phenomena, and abstract ideas' are not patentable." *Mayo*, 566 U.S. at 70 (quoting *Diamond v. Diehr*, 450 U.S. 175, 185 (1981)) (alteration in original).

The Supreme Court articulated a two-step inquiry to identify patent claims that fall within those exceptions. First, courts must examine whether the claim is "directed to" a law of nature or natural phenomenon. *Alice*, 573 U.S. at 217. Second, courts must consider whether the limitations

of the claim apart from the law of nature or natural phenomenon, considered individually and as an ordered combination, "'transform the nature of the claim' into a patent-eligible application." *Id*. (quoting *Mayo*, 566 U.S. at 78). At step two, "simply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable." *Mayo*, 566 U.S. at 82.

Diagnostic claims, like those at issue here, routinely fail both steps of the *Alice/Mayo* test. At step one, the relationship between a particular medical condition, such as cancer, and an observable event, such as the presence of cancer cfDNA, is a natural phenomenon. *See CareDx*, 40 F.4th at 1378 (claim on the detection of naturally occurring organ donor organ cfDNA in the blood and the correlation between donor cfDNA and transplant organ rejection were directed to detecting a natural phenomenon); *Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 750 (Fed. Cir. 2019) (claims on "the correlation between the presence of naturally-occurring MuSK autoantibodies in bodily fluid and MuSK-related neurological diseases like MG" were directed to a "natural law"); *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 760 F. App'x 1013, 1018 (Fed. Cir. 2019) (claims "directed to the natural law that blood MPO levels correlate with atherosclerotic [cardiovascular disease]" were directed to a natural law).

At step two, such claims are not patentable unless they include unconventional claim limitations. *Mayo*, 566 U.S. at 78. Applying conventional diagnostic methods to observe or identify a natural phenomenon is not patent eligible subject matter. *Mayo*, 566 U.S. at 82; *see also CareDx*, 40 F.4th at 1380 ("applying standard techniques in a standard way to observe natural phenomena does not provide an inventive concept").

The Federal Circuit has, therefore, "consistently held diagnostic claims unpatentable as directed to ineligible subject matter," *Illumina, Inc. v. Ariosa Diagnostics, Inc*., 967 F.3d 1319,

1325 (Fed. Cir. 2020), especially where the claim includes only conventional methods for identifying a natural phenomenon such as a disease. *See Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 927 F.3d 1333, 1352 (Fed. Cir. 2019) (Moore, J., dissenting from denial of rehearing *en banc*) ("Since *Mayo*, we have held every single diagnostic claim in every case before us ineligible."). This is true regardless of the naturally occurring phenomenon to which the claims are directed. *See, e.g.*, *CareDx*, 40 F.4th 1371 (detecting cfDNA); *Athena*, 915 F.3d 752 (detecting antibodies); *Cleveland Clinic*, 859 F.3d at 1358 (detecting enzymes).

*CareDx* is particularly instructive here. In *CareDx*, the Federal Circuit affirmed a finding of patent ineligibility involving a diagnostic method for detecting cfDNA that is strikingly similar to the methods disclosed in the Asserted Patents. The court held that claims reciting the "conventional use of existing technologies to detect naturally occurring cfDNA" were ineligible. 40 F.4th at 1379. The claims were invalid because they "add nothing inventive" and instead "recite detection methods that 'simply append[] conventional steps, specified at a high level of generality' to natural phenomena." *Id.* (citing *Mayo*, 566 U.S. at 82).

## V.    ARGUMENT

### A.    The '992 Patent Family And '306 Patent Are Invalid Under 35 U.S.C. § 101

The '992 Patent Family and '306 Patent are directed to a natural phenomenon (cfDNA) detected using conventional methods. They thus claim ineligible subject matter and are invalid.

#### 1.    *Alice* Step One: The Asserted Claims Are Directed To Observing Natural Phenomena

The claims of the '992 Patent Family and '306 Patent are all directed to methods of observing natural phenomena—*i.e.*, naturally occurring cfDNA. The Federal Circuit has repeatedly held that methods of detecting natural phenomena, like those at issue here, are directed to natural phenomena and thus constitute ineligible subject matter. *Ariosa*, 788 F.3d at 1373-76;

*Athena*, 915 F.3d at 752. Delaware courts likewise observe "[i]t is now well settled under Federal Circuit case law that the use of conventional techniques in a standard way to observe DNA in a biological sample is not eligible for patentability[]." *Natera, Inc. v. CareDx, Inc.*, 705 F. Supp. 3d 258, 261 (D. Del. 2023).

In *CareDx*, the Federal Circuit held method-of-detection claims—very much like those here—ineligible because they were directed to the observance of a natural phenomenon. 40 F.4th at 1381. The claims there recited detecting DNA from a transplanted organ in a recipient's cfDNA. *Id.* at 1375. The Federal Circuit found the claims "boil[ed] down to [1] collecting a bodily sample, [2] analyzing the cfDNA using conventional techniques, including PCR,[7] [3] identifying naturally occurring DNA from [a] donor organ, and then [4] using the natural correlation between heightened cfDNA levels and transplant health to identify a potential rejection," and found none of those steps to be inventive. *Id.* at 1379.

Here, the Asserted Patents' claims can likewise be boiled down to: (1) collecting cfDNA from a biological sample, (2) performing conventional sequencing of the cfDNA, including after known preparation (tagging/amplification) methods, and (3) analyzing properties of the cfDNA by known methods (4) to detect its genetic properties.

The representative claims of the '992 Patent Family "begin and end" with the natural phenomena they observe and are thus "directed to matter that is naturally occurring." *Ariosa*, 788 F.3d at 1376. Each of '992 Patent claim 1, '810 Patent claim 1, and '916 Patent claim 13 starts with a step of obtaining a sample of cfDNA and concludes with the detection or determination of a natural phenomenon such as, "genetic aberrations," "somatic genetic variants," or "distinct

---

[7] "PCR" refers to polymerase chain reaction, a prior-art method for amplifying a DNA sample. Ex. A, 5:9-10, 29:65-30:6.

cfDNA molecules." A4-A13. Same goes for the '306 Patent. A1-A3.[8]

In sum, these four patents are method-of-detection claims directed to observing natural properties of naturally occurring cfDNA, a natural phenomenon. *CareDx*, 40 F.4th at 1378-80. Accordingly, they fail *Alice* step one.

2.     *Alice* **Step Two: the Asserted Claims Only Append Conventional Steps to Natural Phenomena**

In *CareDx*, when addressing step two, the Federal Circuit held that the "claimed combination of steps" added nothing inventive to the cfDNA detection claims because "the specification confirm[ed] that" the claimed steps were "a straightforward, logical, and conventional method for detecting cfDNA previously used in other contexts." 40 F.4th at 1380. For example, the specification admitted the recited steps could be carried out using known techniques. *Id.* The Asserted Patents here make similar binding concessions.

Each of the Asserted Patents apply no more than what are admittedly conventional methods for collecting, sequencing, and analyzing naturally occurring cfDNA as of September 2012, the earliest claimed priority date.[9] *See id.* ("applying standard techniques in a standard way to observe natural phenomena does not provide an inventive concept"). The specifications of the '992 Patent Family and '306 Patent,[10] the prior art cited therein, and Guardant's IPR admissions establish that the steps recited in the claims were conventional by that time.

**a. Collecting cfDNA.** Each of the Asserted Patents recite a step to "obtain[]" or "provid[e]"

---

[8]  Although the '306 Patent claim 1 does not expressly recite "detecting," its disclosure acknowledges the patent is directed to a "method for detecting and/or quantifying rare deoxyribonucleic acid (DNA)." A24, 2:19-26.

[9]  The remaining language in each claim limitation, including numerical language such as "tag[ging] at least 20% of the cfDNA molecules," (A5, claim 1(b)), is similarly conventional. *CareDx*, 40 F.4th at 1374, 1380 (claims with specific numeric limitations found to "simply append conventional steps, specified at a high level of generality to natural phenomena" (cleaned up)).

[10]  The '306 Patent disclosure closely tracks the '992 Patent Family's disclosure. The steps recited in the claims of both sets of patents are thus grouped together for purposes of this analysis.

9

cfDNA for analysis. *See* A1-16. The specification for each patent states that known techniques can be used to collect samples of cfDNA for the claimed methods. The '992 Patent Family disclosure states that "cell free polynucleotides may be isolated and extracted using a variety of techniques known in the art." A20, 36:10-18 ("After collection of a bodily fluid, cell free polynucleotides may be isolated and extracted using a variety of techniques known in the art."); A19, 30:31-37 ("[cf]DNA can be extracted using a variety of methods known in the art"); A22, 58:31-32. It further states that cfDNA "may be isolated, extracted and prepared using commercially available kits such as a Circulating Nucleic Acid Kit protocol by Qiagen." A20, 36:12-15. The '306 patent, a year later (2013 priority), confirms that "many methods have been developed" for analyzing cfDNA, and "[m]ost of these methods include sample preparation." A24, 1:46-55. *See also* cited art at A26-A34 that reflects said methods were well-known.

**b. Sequencing cfDNA, Including Tagging With Barcodes and Amplifying.** The sequencing steps in both the '992 Patent Family and the '306 Patent include (1) "tagging" the cfDNA with barcode sequences, (2) "amplification" of the tagged cfDNA to generate sufficient DNA for sequencing, and (3) subsequent "sequencing" of the tagged cfDNA to obtain sequence reads. The Asserted Patents do not claim any novel way of performing these steps, and instead state each one can be carried out using well-understood and conventional methods.

*First*, as to tagging, the '992 Patent Family and the '306 Patent state that "tagging" of cfDNA was conventional. They state that "unique or non-unique identifiers, or molecular barcodes" used for tagging, could be assigned using "methods and systems described by" prior-art patents and applications, each incorporated by reference.[11] A40, 38:31-36; A49, 22:19-25.

---

[11] The '992 Patent Family and '306 Patent state that "[a]ll publications, patents, and patent applications mentioned" therein are "incorporated by reference to the same extent as if each individual publication, patent, or patent application was specifically and individually indicated to

The '992 Patent Family further states that "sample preparation typically involves converting polynucleotides in a sample into a form compatible with the sequencing platform," which "can involve tagging polynucleotides." A38-A39, 32:64-33:4; A36, 6:30-33 (listing known methods for this conversion, including PCR). The '306 Patent similarly acknowledges the routine nature of tagging, including with "duplex tags," and states the "[t]agging disclosed herein can be performed using any method" (A48, 17:35-40) or "a variety of techniques," (A47, 2:1-13).

Guardant admitted in its IPR filings that tagging cfDNA before sequencing is conventional. *E.g.*, A79; A71-A72 ("Prior art consensus sequencing methods conventionally used barcodes to uniquely 'label' original DNA molecules."); A76 ("[A]dapters comprising barcodes . . . were known and well-documented in the prior art."); A69 (by March 2012, barcode-comprising adaptors attached to sample DNA by "known" ligation methods). Guardant also admitted that duplex tagging (*e.g.*, as claimed in the '306 Patent) "to evaluat[e] both strands of a DNA duplex [were] known" by March 2012. A83 ("Skilled artisans appreciated that original sample molecules were conventionally labeled using sequencing adapters (*e.g.*, Y-shaped) comprising barcodes that enabled distinction between sequence reads originating from the different strands of a duplex."); A87 ("[T]he scientific literature by March 2012 described barcoding or tagging techniques and their use in DNA sequencing applications.").

*Second,* as to <u>amplifying</u>, the '992 Patent Family specification states that amplifying tagged cfDNA before sequencing was "typical[]." A39, 33:40-45. It states that tagged cfDNA can be amplified using "amplification reactions (*e.g.*, PCR, qPCR, reverse-transcriptase PCR, digital

---

be incorporated by reference." *E.g.*, A97-A98, 28:65-29:2. Thus, the cited references are part of the specifications for purposes of this analysis. *Finjan LLC v. ESET, LLC*, 51 F.4th 1377, 1382 (Fed. Cir. 2022) ("Incorporation by reference of a patent renders the entire contents of that patent's disclosure a part of the host patent." (internal quotations omitted)).

PCR, etc.)"—all indisputably known methods. A40, 38:44-51. With respect to PCR, for example, it identifies "***commercial kits***" for "amplification." A40, 38:52-59; A41-A42, 42:67-43:2. Likewise, the '306 Patent states the amplification is done by routine methods, including PCR. A50, 29:66-30:2 ("In some cases, high fidelity amplification is performed such as with the use of high fidelity polymerase [] or PCR protocols."); A50-A52, 31:1-2, 29:57-58, 40:54-58 (listing known polymerases used for "high-fidelity amplification").[12] Guardant also admitted in its IPR filings that amplifying cfDNA before sequencing is conventional. *E.g.*, A82 ("Before March 20, 2012, preparation of DNA molecules for next-generation sequencing (NGS) ***conventionally*** included PCR amplification."); A69 (by March 2012, barcode-comprising adaptors could be attached to sample DNA by "***known***" ligation methods).

The '810 Patent claim 1 further recites the step of "selectively enriching the progeny polynucleotides" before sequencing, but this limitation is no less conventional. The '992 Patent Family specification states that off-the-shelf kits can be used to carry out this step. A45, 60:63-65 ("genes are selected for selective amplification using a TaqMan® PCR kit (Invitrogen)").

*Third,* as to <u>sequencing</u>, the '992 Patent Family disclosure refers to sequencing cfDNA by "methods known in the art." A42, 43:29-43 (identifying commercially available sequencing methods, including from Illumina); A40, 37:64-38:11; Abstract ("subsequent sequencing of cell free polynucleotides by techniques known in the art"); A43, 45:65-46:3 (a "sample can be sequenced by a nucleic acid sequencing platform known in the art"); A37, 30:18-22 ("Generally, the systems and methods comprise . . . subsequent sequencing of cell free polynucleotides by

---

[12]  The Federal Circuit has held invalid under Section 101 claims directed to a method for detecting a bacterium because PCR is "well known in the prior art" and "standard." *Roche Molecular Sys., Inc. v. CEPHEID*, 905 F.3d 1363, 1372 (Fed. Cir. 2018); *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1377 (Fed. Cir. 2015) ("Using methods like PCR to amplify and detect [cfDNA] was well-understood, routine, and conventional activity in 1997.").

techniques known in the art . . . ."); A44, 48:37-43. The '306 Patent confirms sequencing could be performed using "methods known in the art." A50, 30:55-67. *See also CareDx*, 40 F.4th at 1380 (sequencing "was a straightforward, logical, and conventional method for detecting cfDNA").

Further, Guardant admitted in its IPR filings that there was "nothing new" about using next-generation sequencing (NGS) to obtain sequence reads from cfDNA. A80 ("[t]here was nothing new about NGS, [adapters comprising] barcodes, or consensus sequencing"); A67 ("sequencing using the Illumina platform" known by December 2010); A73-A74 (referring to "[t]ypical Illumina sequencing workflows"). *See also* cited art at A55-A92, all of which demonstrates that these methods were well-known.

**c. Analyzing and Sorting Sequence Data by Mapping and Grouping.** The final steps of the claimed methods involve analyzing the cfDNA with conventional bioinformatics tools. The '992 Patent Family contemplates using such tools to "align" or "map" the sequenced cfDNA; "grouping" (or partitioning) and collapsing the sequence reads into cumulative consensus sequences; and then reviewing an output file that reflects the cfDNA's genetic properties. *See, e.g.*, A98, 30:52-66. By September 2012, these processing steps were routine.

The first element, "aligning" or "mapping" to a reference sequence, simply refers to the standard practice of comparing the obtained cfDNA sequences to a known human reference sequence—essentially comparing one natural phenomenon to another. None of the Asserted Patents suggests any specific tools are required to perform this step, instead indicating any conventional techniques will do. A100, 35:10-34. Reference sequences were used to determine DNA variations in sequenced DNA and are widely available for this purpose. A100, 35:35-41 ("Human genome sequences useful as references can include the hg19 assembly or any previous or available hg assembly. Such sequences can be interrogated using the genome browser available

at genome.ucsc.edu/index.html."); A96, 25:20-38 (mapping can be performed using a general purpose computer). The '306 Patent contains nearly identical disclosures. A105, 34:18-24. Guardant made similar concessions in its IPR petitions. A127-A128; A131-A132 ("Aligning reads is a basic aspect of NGS."); A133-A134 ("[N]umerous alignment and nucleotide calling programs were publicly available . . . ."); A145-A146 ("[I]t was conventional to use reference sequences as a basis of comparison for sequence information . . ..").

Similarly, the subsequent "grouping," "reducing," and "collapsing" of reads to generate consensus sequences is also accomplished using known methods. The '992 Patent Family acknowledges that "consensus sequences can be generated from families of sequence reads by any method known in the art," and provides examples of conventional "bioinformatics" algorithms for doing so. A101, 47:42-50; *see also* A97, 27:14-26 ("grouping" and "collapsing" can be "execut[ed] by a computer processor"). The '306 Patent, which recites a step of "determin[ing] distinct cfDNA molecules" (step 1e) from the paired/unpaired reads by "mapping," also does not require any specific techniques or include any teachings suggesting it is anything but conventional.

Guardant admitted in IPR filings that "consensus sequencing" that involved grouping and collapsing sequence reads into families based on barcodes was "well-known at the time and described throughout the scientific literature." A79; A87 ("barcoding or tagging methods for consensus sequencing were ***known*** prior to the earliest claimed filing date of the '699 patent"); A141 ("consensus sequencing based on barcoding or tagging was known"); A136 ("DNA molecules in Kinde are provided with one or more UID, followed by amplification, sequencing, and grouping reads into UID families."). *See also* cited art at A106-A162 and A81-A84 that reflects said methods were well-known.

**d. Detecting Genetic Properties from Sequence Data.** Each of the '992 Patent Family

recites a final generalized step to "detect[]" the cfDNA's genetic properties (*e.g.*, "genetic aberrations," "somatic genetic variants," or "genetic variation" in microsatellite regions). The '992 Patent Family disclosure states detection can be performed using general known methods, none of which the patents claim to be new or unconventional. A95, 4:51-56 (listing of existing "methodologies" that can be used); A101, 47:54-59 (same); *see also* A94, 1:46-51 ("detection of genetic aberrations" part of "[b]ackground"). *See also* cited art at A106-A162 and A81-A84 that reflects said methods were well-known. These steps amount to nothing more than the observance of natural phenomena. *CareDx*, 40 F.4th at 1378 (claims for detecting "the level of donor-specific cfDNA" using "conventional measurement techniques" were ineligible); *Ariosa*, 788 F.3d at 1377-78 (claims for "detect[ing] paternally inherited fetal nucleic acid" using conventional means were ineligible). Thus, as in *CareDx*, the Asserted Patent claims "'simply append[] conventional steps, specified at a high level of generality' to natural phenomena" and are ineligible. 40 F.4th at 1380.

## B.    The '693 Patent Is Invalid Under 35 U.S.C. § 101

Like the other Asserted Patents, the '693 Patent's method focuses on the detection of a natural phenomenon: a naturally existing correlation within cfDNA. That correlation is a natural law that is patent subject matter ineligible. The '693 Patent, therefore, is also invalid.

### 1.    *Alice* Step One: Claim 14 Is Directed To A Natural Law

Like the other Asserted Patents, the '693 Patent is directed to observing a natural phenomenon. That the '693 Patent also recites a step to "determin[e] a likelihood of cancer risk" by processing the detected cfDNA "does not supply sufficient inventive concept to make the claim patent-eligible under § 101." *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1380 (Fed. Cir. 2016). Merely identifying a natural law, such as a natural correlation between cfDNA changes and cancer, and applying it through conventional means—here, an undisclosed "processing," a pure mental step—is not enough for eligibility. *Mayo*, 566 U.S. at 79-80; *Cleveland Clinic*, 859 F.3d at

1361; *Esoterix Genetic Labs LLC v. Qiagen, Inc*., 133 F. Supp. 3d 349, 359 (2015) (claims directed to "correlation between a naturally-occurring mutation in a cancer cell, and the likelihood that a particular type of known pharmaceutical compound will be effective in treating that type of cancer" ineligible); *Genetic Techs. Ltd. v. Lab'y Corp. of AmericaHoldings*, 2014 WL 4379587, at *12 (D. Del. Sept. 3, 2014) (claims "[t]o carry out the 'predicting' step, then, the user of the process merely verbalizes the patentee's discovery of the recited natural law" were found ineligible).

The Federal Circuit's analysis in *PerkinElmer, Inc. v. Intema Ltd*., 496 F. App'x 65 (Fed. Cir. 2012), is instructive. That case involved a patent that—just like the '693 Patent—related to disease detection. The claims covered "analytical methods to determine the risk of fetal Down's syndrome." *Id*. at 70. The methods culminated in "a 'determining' step in which the risk of Down's syndrome [was] calculated by comparing [one or two] screening marker measurements with known statistical information." *Id*. The Federal Circuit held the claims ineligible as directed to a law of nature, namely "the relationship between screening marker levels and the risk of fetal Down's syndrome," stating "[t]hat an increased risk of fetal Down's syndrome produces certain analytical results is a natural process." *Id*.

Claim 14 of the '693 Patent fails for the same reasons. Just as the biomarker measurements were collected and then analyzed to assess disease risk in *PerkinElmer*, here sequence information is collected and then analyzed to assess cancer risk—a natural process. 496 F. App'x at 70. Similar to *PerkinElmer*, claim 14's processing step is a mental step, itself patent ineligible. *Id*. at 71; *see also Genetic Techs.*, 818 F.3d at 1380. And, just as in *PerkinElmer*, no further action is taken on the "determination" once made. 496 F. App'x at 71.

The cfDNA collection steps that precede claim 14's processing step, which are simply "physical data-gathering steps," do not save the claim. *PerkinElmer*, 496 F. App'x at 72; *In re*

*Grams*, 888 F.2d 835, 840 (Fed. Cir. 1989) ("[t]he presence of a physical step in the claim to derive data for the algorithm will not render the claim statutory"). As discussed below, those steps do not create anything new or unnatural, and only detect what already exists in nature.

### 2. *Alice* Step Two: Claim 14 Adds No More Than Conventional Steps To The Natural Phenomena To Which The Claim Is Directed

Claim 14 of the '693 Patent fails *Alice* step two because nothing in the claim as a whole gives rise to an inventive concept "sufficient to ensure that that patent in practice amounts to significantly more than a patent upon the nature law itself." *Mayo*, 566 U.S. at 73. This is true both when looking at the claim limitations individually and as an ordered combination. Here, claim 14 only recites conventional steps, specified at a high level of generality and in a routine order, to detect naturally occurring cfDNA. This renders the claim unpatentable. *Id.* at 79, 82; *In re BRCA1- & BRCA2-Based Hereditary Cancer Test Pat. Litig.*, 774 F.3d 755, 764 (Fed. Cir. 2014) ("Nothing is added by identifying the techniques to be used in making the comparison because those comparison techniques were the well-understood, routine, and conventional techniques that a scientist would have thought of when instructed to compare two gene sequences.").

The '693 Patent recites a number of overlapping steps with the other Asserted Patents, including collection, sequencing, and analysis steps. However, the '693 Patent's claimed priority date is ***more than six years later*** (January 2019 versus September 2012). By this time, the cfDNA field had advanced significantly, and there can be no genuine dispute that the techniques in the claimed steps (recited in even less detail than the earlier claims) were all well-known and widely used by this time, including as addressed below.

**a. Collecting cfDNA.** As of the claimed '693 Patent priority date in 2019, collection of cfDNA was well known in the art. *See, e.g.*, A164, 18:20-32; A174-A175 ("The presence of circulating cell-free nucleic acids in cancer patients has been well documented, and the correlation

between elevated levels of free circulating DNA (fcDNA) and cancer has been established."); *see* Section A.2.a, *supra*. *See also* cited art at A165-A177 that reflects said methods were well-known.

**b. Capturing cfDNA Molecules.** To obtain cfDNA sequence information for purposes of making a comparison, the '693 Patent specification describes using conventional probe techniques to isolate different genetic regions from collected cfDNA. A181, 21:22-23 ("Capture may be performed using any suitable approach known in the art."). It describes capturing from the cfDNA two distinct targets: a sequence-variable region (which may contain DNA mutations) and an epigenetic region (which may contain modified DNA, *e.g.*, methylated DNA). A179, 1:61-67. The '693 Patent acknowledges why those of ordinary skill would look to these specific regions to detect these natural phenomena. A179, 1:18-26.[13] The "sequence-variable" region is analyzed for "known" "cancer-associated mutations." A182, 27:50-57. And the epigenetic region can be analyzed using "known approaches" to detect methylation. A185, 42:8-12.

The use of probe capture to isolate DNA was also well known by 2019, and indeed by much earlier. The '693 Patent states that "[c]apture may be performed using any suitable approach known in the art." A181, 21:22-23; *see also* A180, 19:16-27 ("Thus, a probe hybridizes to a target sequence or replicate thereof to a sufficiently greater extent than to a non-target sequence, to enable capture or detection of the target sequence. Appropriate hybridization conditions are ***well-known in the art***, may be predicted based on sequence composition, or can be determined by using routine testing methods"); A181, 21:30-35 ("[t]hose skilled in the art will be familiar with appropriate conditions [for capture] given general knowledge in the art regarding nucleic acid hybridization.").

---

[13] Analysis of sequence variants and changes in epigenetic markers to assess cancer risk was well-known years before the '693 Patent. The '992 Patent describes genetic testing for cancer based on detecting "rare genetic alterations (e.g., sequence variants) or changes in epigenetic markers" as part of the known "[b]ackground" in the field in 2012. A94, 1:53-57.

Similarly, it was well known to use capture probes to target variable and epigenetic genomic regions. The '693 Patent describes known probes for targeting those regions. A187, 57:27-59:22 ("probes for the [epigenetic region]"); A188, 59:23-60:22 ("probes for the [variable region]"); *see also* A184, 31:44-45 ("suitable target region sets are available from the literature").

Nor was there anything new or unconventional about capturing cfDNA with different capture yields. It was known that binding probes "can be configured to provide higher capture yields for the [variable region]" by varying concentration and/or affinity. A186, 55:56-63, 56:28-33 ("affinity can be modulated in any way known to those skilled in the art."), 56:58-61. Separating target DNA from untargeted (thus uncaptured) DNA, which can be simply accomplished by "washing," was likewise routine. A181, 21:40-43.

Guardant has conceded that using probe capture to target certain regions of cfDNA for subsequent sequencing—which it referred to as target enrichment—was "well-known" long before the '693 Patent's claimed priority date. *See, e.g.*, A191 ("targeted enrichment using bait hybridization and [NGS] were well-known 'off the shelf' technologies as of the December 2010 filing date"). Guardant further admitted that by December 2010 it was "known" to sequence regions with rare mutations to an increased sequencing depth relative to other regions. A192 ("[I]t was known that the sensitivity for detection of mutations is related to frequency of the interval comprising the mutation in the sample. . . . That is, low frequency intervals need be sequenced to a greater depth than high frequency intervals for efficient detection.").

**c. Sequencing cfDNA, Including At Different Sequencing Depths.** As explained in Section A.2.b, sequencing cfDNA was a conventional practice years before the disclosures of the '693 Patent. *See also* A194, 49:21-43, 50:45-57. Sequencing depth is an inherent element of sequencing, and as Guardant itself has argued, it was known to use increased sequencing depths

19

on samples requiring more sensitivity. *See* Section B.2.b, *supra*; A204 ("That is, low frequency intervals need be sequenced to a greater depth than high frequency intervals for efficient detection"). *See also* cited art at A195-A197 that reflects said methods were well-known.

**d.  Analyzing Sequence Data—Obtaining Sequence Reads, Mapping to Reference Sequences.** Claim 14 recites obtaining sequence reads from sequencing, and then mapping those sequence reads. As explained in Section A.2.b, sequencing and mapping were conventional before 2019. The '693 Patent teaches that this step (indeed, "all of the steps") can be "automated" including by "invoking functionality within[] *existing* sequence analysis platforms," (A208, 52:10-28), and identifies publicly available software from 2009 for aligning/mapping, (A208, 52:50-62). *See also* cited art at A210-A214 that reflects said methods were well-known.

**e. Processing Sequence Data to Determine a Likelihood a Subject Has Cancer.** Claim 14 fails to recite any details that would convert its purely mental step of processing into something inventive. *See Natera, Inc.*, 705 F. Supp. 3d at 263 ("the mental process of 'subsequent analysis' to what are admittedly conventional techniques cannot save the [] patent from § 101's bar"). The processing (recited in only the most generalized terms) purports to use conventional data—mapped reads—and does not recite any unconventional or non-routine use of that information. *See* A216-A217, 23:62-24:6, 51:46-64, 52:29-49.

Thus, representative claim 14 purports to apply the claimed natural law using only well-understood, routine, and conventional techniques. This cannot transform an otherwise ineligible claim into a patent-eligible application. *Alice*, 573 U.S. at 225-26.

## VI.    CONCLUSION

For the foregoing reasons, Tempus respectfully requests that the Court find the Asserted Patents are ineligible under 35 U.S.C. § 101 and dismiss the Complaint with prejudice.

Dated: October 21, 2024

*Of Counsel*:

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Kevin P.B. Johnson
Andrew Bramhall
Margaret Shyr
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
(650) 801-5000
kevinjohnson@quinnemanuel.com
andrewbramhall@quinnemanuel.com
margaretshyr@quinnemanuel.com

David Bilsker
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
davidbilsker@quinnemanuel.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

/s/ *Pilar G. Kraman*
Pilar G. Kraman (No. 5199)
Jennifer P. Siew (No. 7114)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
jsiew@ycst.com

*Attorneys for Tempus AI, Inc.*

21

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on October 21, 2024, a copy of the foregoing

document was served on the counsel listed below in the manner indicated:

**<u>BY EMAIL</u>**

David E. Moore
Bindu A. Palapura
Andrew L. Brown
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
dmoore@potteranderson.com
bpalapura@potteranderson.com
abrown@potteranderson.com

Jordan R. Jaffe
Wendy L. Devine
WILSON SONSINI GOODRICH & ROSATI
One Market Plaza,
Spear Tower, Suite 3300
San Francisco, CA 94105
jjaffe@wsgr.com
wdevine@wsgr.com

Michael T. Rosato
Eric P. Tuttle
WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104
mrosato@wsgr.com
eric.tuttle@wsgr.com


YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Pilar G. Kraman*
Pilar G. Kraman (No. 5199)
Jennifer P. Siew (No. 7114)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
pkraman@ycst.com
jsiew@ycst.com

*Attorneys for Defendant Tempus AI, Inc.*